**HENDERSON et al. v. TERRELL et al.**
No. 621.

District Court, W. D. Texas, Austin Division.
July 23, 1938.

148

Before HUTCHESON, Circuit Judge, and McMILLAN and WEST, District Judges.

HUTCHESON, Circuit Judge.

Plaintiffs are the successors in interest of Henderson Company,[1] a corporation, and F. C. Henderson, Inc.[2] As such successors they own and operate a gasoline manufacturing plant in the town of Sanford, Texas, in the West Panhandle field. Plaintiffs in addition are the owners and holders of a number of casinghead gasoline contracts, under the terms of which they have agreed to purchase gas from the various wells located upon the leases covered by such contracts and to process such gas so purchased in its gasoline manufacturing plant. In connection with such processing they have a contract with the Combined Carbon Company, under which they are obliged to furnish that company its gas requirements for the purpose of manufacturing carbon black. Defendants are the members of the Railroad Commission and the Attorney General of Texas.

The suit was for an injunction interlocutory and permanent against defendants, to restrain them from restricting plaintiffs' production of sour gas from the seventeen wells they own or operate in the West Panhandle field below the amount which plaintiffs have contracted to deliver, and for which they have a market. Plaintiffs' bill attacks the statute as authorizing the Commission to take, and the orders as taking, plaintiffs' property without due process of law, and therefore in violation of the Fourteenth Amendment to the Federal Constitution, U.S.C.A.Const. Amend. 14, in that the statute authorizes and the Commission provides, for a restriction of plaintiffs' production, though plaintiffs are producing without waste, in order to compel plaintiffs to share the market for their gas with owners and operators of other wells having no market. There was a further claim that if the statute was valid, the orders were invalid, because in entering them the Commission did not follow, but disregarded the statute.

The defense as to the statute was, that enacted in the due exercise of the police powers as a waste measure, it limited and restricted the use of sour gas for carbon black an inferior use, and at the same time

Fischer & Fischer, of Amarillo, Tex., for complainants.

William McCraw, Atty. Gen., and William C. Davis and Wm. Madden Hill, Asst. Attys. Gen. (E. H. Foster, of Amarillo, Tex., of counsel), for respondents.

[1] Henderson Company v. Thompson, D. C., 14 F.Supp. 328.

[2] Henderson Company v. Thompson, 300 U.S. 258, 57 S.Ct. 447, 81 L.Ed. 632.

made provision to protect each of the properties affected by the restriction, from cognizable and preventable drainage by any others. The defenses as to the orders were that, entered in accordance with and to carry out the mandate of the statute to restrict production, and to protect against drainage, they reasonably did so.

Though plaintiffs and defendants are both citizens of Texas, plaintiffs bring their suit as though in addition to being one arising under the Constitution and laws of the United States it is also one under the Texas statutes authorizing a review of the Commission's orders by suits filed against the Commission in the State District Court of Travis County. Authorized as plaintiffs would be, if the requisite diversity existed, to bring their suit under the statute in the Federal District Court of Travis County, McMillan v. Railroad Comm. of Texas, D.C., 51 F.2d 400; Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 14 S.Ct. 1047, 38 L.Ed. 1014, we think it plain that, residents of Texas as they and defendants are, plaintiffs cannot maintain their suit as a statutory suit against the Commission in this court. Their bill, however, does sufficiently make out a case arising under the Constitution and laws of Texas of which this court has jurisdiction, one requiring three judges. A case for three judges being thus made on the plaintiffs' pleadings, the statutory court was assembled, and it appearing that the effect of the orders was to reduce plaintiffs' takings from their wells substantially as claimed, that the case could be promptly and with little delay heard and disposed of on final hearing, an interlocutory injunction was issued, and the cause was set for an early final hearing. This hearing has been had, and the cause is before us on full proofs for disposition on the merits.

In addition to the Commission's orders and findings which went fully into the nature, the condition, and the history of the Panhandle gas field as a whole, and of it as divided, under statutory authority, into the East and West fields, there was a detailed showing made by oral testimony, maps, graphs, and physical representations as to the Sanford area, the area particularly involved in plaintiffs' suit.

So much has already been judicially written[3] as to the history, physical, political and legal, and as to the general conditions in the Panhandle field, that we need not re-write upon them here. It will be sufficient to refer to those decisions where these matters are fully and in detail set out.[4]

As to the Sanford area, where plaintiffs' wells are located, there was full proof as to the potentials of plaintiffs' and other wells, as to the amount of gas which had been drawn from the wells owned or under the control of plaintiffs in the past, as to the past and present gas pressure in these and other areas in the field, and as to the general physical conditions under which gas had been and is being produced from that area, including particularly plaintiffs' wells.

This testimony as to physical conditions was without substantial conflict, except as to the condition as to water, of some of plaintiffs' wells. It showed that in the particular area of plaintiffs' production, and particularly, as to wells owned by, and with which plaintiffs had connections, tremendous amounts of gas had been drawn out. Indeed, the takings from those wells had been far in excess of the amount of gas which had originally underlain the structure there, but notwithstanding this, there had been such rapid and heavy migration into the low pressure area, caused by the heavy production of plaintiffs' and others in that area, that there was still nearly as much gas under plaintiffs' lands as had originally been there.

The proof thus demonstrated beyond peradventure, that in restricting plaintiffs' production in the future, the orders did not operate injuriously as to them, as the orders entered in the Consolidated Case,[5] had operated in subjecting the plaintiffs' properties there to a continuance of the drainage they had already undergone.

The evidence further showed that during the period of unrestricted drainage from these wells, the pressure had dropped from the original or virgin pressure

---

[3] Consolidated Gas Utilities Corporation v. Thompson, D. C., 14 F.Supp. 318, 319, 320, 321.

[4] Consolidated Gas Utilities v. Thompson, supra; Thompson v. Consolidated Gas Utilities Corp., 300 U.S. 55, 57 S. Ct. 364, 81 L.Ed. 510; Henderson Co. v. Thompson, D. C., 14 F.Supp. 328; Id., 300 U.S. 258, 57 S.Ct. 447, 81 L.Ed. 632.

[5] Note 4, supra.

throughout the field, of 440 pounds, to a low in some wells, of 210 pounds. It showed too, that in the period of restricted production, beginning in 1935, and particularly since 1937, the pressure at and around plaintiffs' wells though tremendous amounts of gas were still being drained out, had risen to some extent. It was thus shown not only that these lands had been heavily draining other lands, but that upon a restricted production their reserves had risen and would continue to rise; and that from the restricted production proposed, plaintiffs would not suffer damage, but would experience a building up of their reserves.

The only real dispute in the case, outside of that arising on the pressure or absence of water in some of plaintiffs' wells, was in the matter of opinion evidence, as to whether the proration formula the Commission had used bore a reasonable relation to the statutory purpose they were endeavoring to execute. As to this matter of opinion there was the sharpest conflict. Plaintiffs' witnesses gave it as their opinion that the Commission's proration formula, $\frac{2}{3}$ allocation of production to the acreage containing the well, by the observed pressure at the well; and $\frac{1}{3}$ of the allocation to the potential of the well, by taking the acreage factor at 640 acres in the West, instead of at 160 acres, as in the East Panhandle field, and in giving $\frac{2}{3}$ of the allocation to acreage to times pressure, and only $\frac{1}{3}$ to the potential of the well, was neither fair nor just, nor in accord with the statute. They declared that it operated unjustly as to plaintiffs, with many wells of high potential and small acreage, to deprive them of their property, and was directly contrary to the statutory provision[6] under the authority of which the proration was made.

Defendants' witnesses were all of the opinion, and the Commission found, that the formula adopted most nearly complied with and carried out the general mandate of the statute, to justly and fairly allocate and apportion the allowable, and that the proration be so made as to prevent cognizable and preventable drainage of one tract by another. It was here that the

real issues between plaintiffs and defendants as to the validity of the statutes and orders, were joined. Plaintiffs throughout insisted that the purpose and effect of the orders was to discriminate against plaintiffs, by severely reducing their allowable, so as to compel plaintiffs to buy from others having no market. Defendants throughout insisted that plaintiffs' real complaint was, that having enjoyed for years a preferential position against other owners in the field under which they drained huge quantities of gas from land other than their own for use in their business, while keeping their own reserves substantially intact, were struggling to perpetuate for the future this situation of cognizable and preventable drainage; the very situation which the statute required the Commission to remedy. Plaintiffs counter that here is the reason and the crux of the whole matter. That the orders as entered do not have the purpose or the effect of preventing cognizable and preventable drainage in the future; they have a punitive and reparative purpose: The purpose and effect of punishing plaintiffs for their past; the purpose and effect of making reparation to those whose lands have been drained, by requiring plaintiffs in the future to buy from them. They insist that under the Constitution the Commission may not be given, the statute has not conferred, any such power, and that the orders being punitive and reparative as to past drainage, and not preventative as to future drainage, may not stand.

We do not agree with plaintiffs that the orders are punitive or retributive. We think it plain that they were written to, that they do, speak only prospectively and for the future. We find nothing in them of a punitive or reparative nature. The orders and findings of the Commission show that various formulas were considered, and that the one adopted was adopted because it appeared most equitable and just in prorating production for the future as the statute provides, over the wells in the field. The Commission did not find, nor did the evidence before us afford, a basis for a finding, that the formula the Commission used was correct to the

---

[6] "In ascertaining the drainage area of a well, the Commission shall take into account such factors as are reflected in the productive capacity of a gas well, including formation pressure, the permeability and porosity of the producing forma-tion, and the well bore's structural position, together with all other factors taken into account by a reasonably prudent operator in determining the drainage area from a gas well." Vernon's Ann.Civ.St. Tex. art. 6008, § 13.

point of absoluteness and unchangeability. The statute recognizing that absolute perfection may not be attained to, and that changing conditions will require changing orders, provides for monthly allocation hearings by the Commission. Plaintiffs and all other persons in the field are at liberty to complain of the orders before the Commission, and to seek an adjustment of their terms. If a test of the formula, as applied to their wells, discloses that the effect of the order is not to prevent cognizable and preventable drainage of other lands, or is to cause such drainage from plaintiffs' lands, the Commission is obligated to, we may assume that it will, by appropriate amendment, correct the condition. Unless, then, we find from the evidence before us, or experience shows that the order is a capricious one, that is, it more drastically reduces plaintiffs' production than the necessities of the case require, or operates unjustly to cause damage to plaintiffs, plaintiffs may not, if the statute upon which the order rests is valid, enjoin them. For the fact, if it be a fact, that a better formula could be found for prorating the production among the wells in the field, than the Commission used, is not ground for an injunction.

■ Plaintiffs' burden now is a heavy one, to show that the order is violative of the statute, or if in conformity with it, that the statute is unconstitutional as taking plaintiffs' property without due process.

We take up, to dispose of it first, the primary question in the case, whether Section 2, of Senate Bill 407,[7] authorizing the proration among all the sour gas wells in the area, of the daily market demand for carbon black so as to prevent cognizable and preventable drainage of gas from one property to another, is unconstitutional, as authorizing a taking of plaintiffs' property without due process.

■ We see nothing in the provision at all violative of due process. We see in it only a reasonable, indeed, almost a necessary exercise of the police power to protect owners of wells, whose unrestricted right of capture the statute has lawfully invaded, in order to protect the gas reserves from dissipation in inferior uses, from having their gas drained away by the disproportionate takings, from the reservoir, of other owners.

Plaintiffs concede, as they must, having already had the question adjudicated against their predecessors in prior suits, that the state has the power to prevent the wasteful use of gas, Henderson v. Railroad Commission, D.C., 56 F.2d 218, and to regulate or prevent altogether its appropriation to inferior uses, such as the making of carbon black. Henderson Co. v. Thompson, 300 U.S. 258, 57 S.Ct. 447,

[7] "Sec. 2. In any common reservoir in this State producing both sweet and sour gas, there shall never be produced from such common reservoir for utilization in carbon black manufacture, a maximum daily volume of sour gas from such gas wells in excess of seven hundred fifty million (750,000,000) cubic feet which daily volume of sour gas from gas wells shall be prorated by the Commission among all the sour gas wells in such reservoir so as to prevent cognizable and preventable drainage of gas from tracts of land in such sour gas producing area segregated as to surface position and common ownership on which such sour gas wells are located; provided that if the daily demand for sour gas from gas wells for utilization in carbon black manufacture is less than the daily maximum allowable hereinabove permitted, the total daily volume of gas from gas wells from such sour gas area for utilization in carbon black manufacture shall be equal to such daily demand which demand shall be determined by the Commission and shall be prorated among all the sour gas wells in such area as hereinabove provided.

"If a lawful daily demand exists for sour gas from gas wells for purposes of utilization permitted by existing law, other than the manufacture of carbon black, such additional demand shall be added to such daily demand for carbon black manufacture as hereinabove set forth, which sum shall constitute the daily volume of sour gas from gas wells which may be withdrawn from such common reservoir for utilization. Such daily volume shall be prorated by the Commission among the sour gas wells in such area on the basis hereinabove set forth.

"It shall be unlawful for any person to produce sour gas from any sour gas wells in such reservoir in excess of the daily allowable production for such gas wells as fixed by the orders and schedules of the Commission. The rate of production from any sour gas well shall be deemed to be the daily average rate of production for the calendar month." Vernon's Ann.Civ.St.Tex. art. 6008a, § 2.

81 L.Ed. 632. They concede, too, that the limitation to 750,000,000 cubic feet of sour gas per day of the take for carbon black manufacture, from a field producing both sweet and sour gas, is valid and enforcible, and that when the production of sour gas for carbon black reaches that maximum limit the production of the wells in the field from which the gas is to be taken, can lawfully be prorated. Their attack is upon that part of the statute which provides that if the daily demand for sour gas from gas wells for utilization in carbon black manufacture is less than the daily allowable, the total volume of gas for use in carbon black manufacture shall be equal to the daily demand, which demand shall be determined by the Commission and shall be prorated among all the sour gas wells in the area. Their contention is that this provision is invalid as having no reasonable relation to the protection of natural resources.

Plaintiffs, in short, base their complaint against the statute and orders in their case primarily upon the fact that instead of 750,000,000 cubic feet per day, only to wit, 690,000,000 cubic feet are now being produced, and they say that since the production is within the maximum the statute fixes, the Legislature may not authorize the Commission to, the Commission may not, prorate it.

■ We think this view overlooks the nature and source of the power to prorate the production from wells whose output is lawfully limited. These are to be found in the fact that whenever the Legislature imposes lawful restrictions upon the quantity of oil or gas that may be produced, so that thereafter owners may not any longer, under the common-law rule of capture, fully fend for themselves, the duty rests upon the Legislature to make provision for the proration and distribution of the allowed amount among the wells in the field, so that no one of those thus limited may take undue advantage of any other.

■ The source and nature of the power then being found in the fact that as a corollary to its lawfully imposing limitations upon the oil and gas an owner may produce from his wells, the state must make provision for justly apportioning the amount thus limited among those entitled to take it, it follows that where there is a limit set on production the obligation as clearly rests upon the state when the limit of production as here, is about to be, as when it is, fully reached. There is in short no difference in principle between the power of the state and of the Commission to prorate the production of sour gas for carbon black manufacture, when the demand is, as here, 690,000,000 cubic feet per day, and when it is, or exceeds, 750,-000,000 cubic feet.

The validity of the statute thus determined, it remains only to consider plaintiffs' attack upon the orders. This attack is general as to all of plaintiffs' wells, that the orders had been entered in violation of the settled principle that conceding the right to prorate, the interests of individuals in particular wells must not be unduly sacrificed to a general formula for the control of them all, which does not take into consideration the condition and attributes of each well. Or, as we have put it in other cases, statutory proration must be made upon the basis of the actual, rather than the theoretical, conditions, and must take due account of the characteristics and attributes of each well and tract of land. People's Petroleum Producers v. Sterling, D.C., 60 F.2d 1041; Amazon Petroleum Corp. v. Railroad Comm., D.C., 5 F.Supp. 633. The attack is particular as to some of the wells, that the proration has cut the production down so low as to in effect cause them to be destroyed through water intrusion. The claim is that at least as to these wells, the application of the general formula violates both statute and Constitution, because it does not give due consideration to the condition of the particular wells. It is insisted that more drastically than the public interest requires, and to the direct detriment of plaintiffs, it unduly curtails and prevents their operation, and thus takes plaintiffs' property without due process.

We find no failure here on the part of either the Legislature or the Commission, to consider the individual rights of the individual owners. The Legislature has definitely declared that the wells must be prorated so as to prevent cognizable and preventable drainage, and that in doing so all relevant factors must be taken into consideration. By so declaring it has fixed a simple and lawful basis for the action of the Commission. The Commission in turn has prorated the wells under a formula, which the evidence before us shows will undoubtedly prevent the continuance of the clearly cognizable drainage which has been,

going on. Under the statute the Commission is obligated to consider and determine where drainage is going on, and in making proration to so adapt its formula, as to prevent this, as far as may be. In Thompson v. Consolidated, supra, a very different situation was presented. In the first place the statute there construed provided only for the protection of correlative rights. It fixed no standard to go by, either in the ascertainment or the protection of those rights, but apparently left both to the unrestricted judgment of the Commission. We held there that such a broad and uncontrolled delegation was invalid, and that the order illustrated the invalidity of the delegation by its result in compelling some producers to shut down, not because they were draining the properties of others, but merely because other producers had no market for their gas. Such conditions do not exist here, either in law or in fact. In fact, the converse of that situation, where the orders resulted in draining the plaintiffs in the interest of those who had in the past been draining them, exists here. In this case there is no question, as there was in that one, of requiring complainants to buy their own gas back from persons who had, by excessive and wasteful uses, long been taking it from them. In this case there is merely the requirement that plaintiffs be not allowed more than any others are, to appropriate the greater part of the limited amount allowed to be taken, by draining it from others.

We think the statute is simply and clearly phrased to give effect to a public policy, and to exercise the police power in respect of matters which the courts of Texas and of the United States uniformly hold it is the right of the state by statute, to control. This right extends to preventing one person from unduly draining from under the lands of another, oil and gas lying in a common pool equally when the undue drainage is for wasteful uses, and when the rule of capture no longer applying, because of lawful statutory limitation, one of the owners, by drawing more than his due proportion of the limited share, is draining the lands of his co-owners.[8]

We find nothing unreasonable in the statute, nothing unreasonable in the orders. For all that the statute does, all that the orders do, is to make limitation and proration effective by putting an end to an existing unreasonable drainage condition, and preventing its continuance in the future. Neither the statute nor the order operates retrospectively, either punitively or reparatively; both operate prospectively. So operating, they merely say to plaintiffs "you may produce from your wells of the total amount limited in a due proportion with every other well in the field. You may not produce more."

Upon the record in this case plaintiffs would have to make a very clear showing that the orders operate to injure them, in view of the admitted fact that for years they have been operating on gas drained by them from the lands of others.

We have given careful consideration to the testimony, and have endeavored to carefully weigh the conflicting opinions. We cannot do other than to find that the evidence has not overthrown the presumption attached to the Commission's order, and that it so approximates a fair proration and allocation among the wells affected by it that it must stand. In a situation of this kind, no absolute perfection may be looked for; a reasonable approximation is the best that may be attained to.[9]

---

[8] Brown v. Humble Oil & Ref. Co., 126 Tex. 296, 83 S.W.2d 935, 87 S.W.2d 1069, 99 A.L.R. 1107, 101 A.L.R. 1393; Danciger Oil & Ref. Co. v. Smith, D.C., 4 F.Supp. 236; Sun Oil Co. v. Railroad Comm., Tex.Civ.App., 68 S.W.2d 609; Hathorn v. Natural Carbonic Gas Co., 194 N.Y. 326, 87 N.E. 504, 23 L.R.A.,N.S., 436, 128 Am.St.Rep. 555, 16 Ann.Cas. 989; Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369, Ann.Cas.1912C, 160; Ohio Oil Co. v. Indiana, 177 U.S. 190, 20 S.Ct. 576, 44 L.Ed. 729; Walls v. Midland Carbon Co., 254 U.S. 300, 41 S.Ct. 118, 65 L.Ed. 276; Amazon Petroleum Corp. v. R. R. Comm., D. C., 5 F.Supp. 633; F. C. Henderson, Inc., v. R. R. Comm., D. C., 56 F.2d 218.

[9] Amazon Petroleum Corp. v. R. R. Comm., D.C., 5 F.Supp. 633; Williams v. Baltimore, 289 U.S. 36, 53 S.Ct. 431, 77 L.Ed. 1015; Standard Oil Co. v. Marysville, 279 U.S. 582, 49 S.Ct. 430, 73 L.Ed. 856; Brown v. Humble Oil & Ref. Co., 126 Tex. 296, 83 S.W.2d 935, 87 S.W.2d 1069, 99 A.L.R. 1107, 101 A.L.R. 1393; Bayside Fish Flour Co. v. Gentry, 297 U.S. 422, 56 S.Ct. 513, 80 L.Ed. 772; Pacific States Box & Basket Co. v. White, 296 U.S. 176, 56 S.Ct. 159, 80 L.Ed. 138, 101 A.L.R. 853; Thompson v. Consolidated Gas U. Corp., 300 U.S. 55, 57 S.Ct. 364, 81 L.Ed. 510.

Considering that the question of allocation is always potentially before the Commission, and can be brought before it at all reasonable times for new allocations and new arrangements, we think it clear that the Commission's action under the statute here complained of should not be enjoined either in whole or in part.

Plaintiffs made no showing that they had applied to the Commission for relief, either general, or as to the particular wells they claimed water damage to. Not only is it in general their right to apply to the Commission for relief from particular inequities in any of the orders, but the orders in question make provision for their doing so.

We can but assume that if they apply to the Commission for relief as to these particular wells, such exception will be made as to them, if their proof shows it necessary, as will prevent their being injured. Before us the evidence on the point is greatly conflicting. Plaintiffs' evidence, if believed, shows that the reduction as applied to these wells, is too great for safety. The defendants' evidence is equally positive that it is not. Indeed, the showing they make here is that actual operations under the reduction have shown that no injury has occurred or will occur. Plaintiffs not having applied to the Commission for relief as to these wells, we do not find it necessary to make a determination as to this question. We must assume, that the relief will not be denied upon plaintiffs' application, if they can show the existence of the conditions claimed.

Recognizing however, the clear right of plaintiffs to relief from this court, if the Commission, upon due application, refuses to correct any injustices which experience under the order shows have been visited upon plaintiffs, either general or as to particular wells we will, while denying the injunction prayed for, decline to dismiss the bill. The cause will be retained on the calendar with the right in plaintiffs to apply, by supplemental bill in it, for relief, upon a showing, after sufficient experience under the operation of the order, either that any of their wells are being, or are in danger of being drained because of its operation, or that under the formula plaintiffs are themselves being discriminated against and drained, and that, after due application and hearing before the Commission, relief has been unjustly denied them.

Let a decree therefore be drawn, refusing the injunction but retaining the cause until sufficient time for trial of the formula has elapsed, with the right to plaintiffs to apply by supplemental bill herein, for relief if, after such time has elapsed, and after application, the Commission has denied them relief, they are advised that under the facts as they then appear, the orders deprive them of their property without due process, or otherwise unconstitutionally affect them.